Hess CROSSLAND, Appellant,

v.

CONTINENTAL CASUALTY COMPA-NY, a foreign corporation, Appellee.

No. 8668.

United States Court of Appeals
Tenth Circuit.

March 16, 1967.

Robert D. Hudson, Tulsa, Okl. (Hudson, Wheaton & Brett, Tulsa, Okl., with him on the brief), for appellant.

B. W. Tabor, Tulsa, Okl. (Rucker & Tabor, Tulsa, Okl., with him on the brief), for appellee.

Before MURRAH, Chief Judge, and HILL and SETH, Circuit Judges.

SETH, Circuit Judge.

The plaintiff-appellant has taken this appeal from a jury verdict for the appellee insurance company. The question presented for the jury's determination was whether the death of the appellant's wife, the insured, was "accidental" within the terms and provisions of the policy issued by appellee which provided accidental death benefits of $50,000. In response to two interrogatories submitted by the trial court, the jury answered to the first that the insured's death was not the result of an accidental bodily injury, and to the second that the insured's death was the result of suicide or an attempt thereat. The accident policy in question provides coverage for accidental death but expressly excludes the payment of benefits for death resulting from suicide, self-destruction, or attempts thereat.

The issues raised by appellant on this appeal include the trial court's failure to direct a verdict for plaintiff-appellant, and improper instructions to the jury.

It appears from the record that the insured had been an alcoholic for some twenty years prior to her death. Because of her alcoholism, she had been hospitalized ten or twelve times in the five years immediately preceding her death for medical and psychiatric care. It also appears that during her drinking episodes she was inclined toward excessive use of barbiturates to induce sleep, and the evidence discloses that she required more barbiturates for this purpose than the average person. The insured's physician testified that the insured "developed a terrific tolerance for those sleeping pills, where it took quite a few of them to give her a night's sleep." The doctor further testified that the insured would "overtake" sleeping pills during a drinking episode, and that he had to discontinue giving the insured prescriptions for the pills and dispense them to the insured only as they were required.

The record discloses these facts surrounding the insured's death: The appellant, who was the husband of the insured, testified that she had been drinking for a week prior to her death, but he could not say if she had been drinking during the night of August 7th–8th because he had retired early. The appellant arose about 7:00 a. m. on August 8th and discovered the insured in the living-room suffering with a lacerated knee. She did not then appear to be drinking, but the appellant thought she acted like she had taken a sleeping pill. She had already telephoned the doctor, and the appellant left for his office when the doctor arrived. When the doctor sutured the insured's knee, he thought the insured looked like she had a hangover. After the doctor left, the maid arrived, and found the insured in bed. The maid testified that she could not tell whether the insured was then intoxicated. The maid heard her running water in the bathroom and flushing the toilet, but did not see her take any pills or drinks. When the maid left, between 1:30 and 2:00 p. m., the insured was "watching television." At 3:00 p. m., a friend of the insured came to the house and discovered her in bed unconscious. The friend summoned an ambulance and the insured was pronounced dead at the hospital.

The appellant's position during the trial and on appeal is that the insured, owing to her stuporous post-drinking condition or to the pain attending her lacerated knee and the broken ribs, also suffered in her fall that day, took the fatal overdose of sleeping pills without knowing or remembering how many pills

she had taken or was then taking, thus asserting that the insured did not take the barbiturates with any intention of taking her own life.

The plaintiff-appellant put on his case, and at its conclusion the defendant also rested. Both parties asked for a directed verdict.

■ The first error assigned by the plaintiff-appellant is the trial court's refusal to direct a verdict against the insurance company because there was insufficient evidence from which the jury could infer that the insured had died by suicide or an attempt thereat. The way in which appellant has stated this point indicates the problem of proof he faced, but does not present the issue on appeal. The appellant argues the proof as to suicide, and much of the argument is so directed. However, the burden the appellant had was to demonstrate that the death of the insured was accidental. This was a difficult task, and necessarily required the use of negative proof. Thus the record shows that the case developed on direct and cross-examination around the inferences to be drawn from facts and circumstances which were unquestioned.

Under these circumstances should a motion for a directed verdict have been granted? In Peter Kiewit Sons Co. v. Clayton, 366 F.2d 551 (10th Cir.), we described the standard by which a trial court's disposition of a motion for directed verdict should be reviewed on appeal as follows:

"[T]he evidence and the inferences to be drawn therefrom must be considered in the light most favorable to the party against whom the motion is directed. If, when viewed in this manner, the evidence and the inferences to be drawn therefrom, are such that reasonable minded persons in the exercise of fair, impartial judgment may reach different conclusions upon the questions of fact involved, the motion should be denied and the question submitted to the jury."

See also Christopherson v. Humphrey, 366 F.2d 323 (10th Cir.); High Voltage Engineering Corp. v. Pierce, 359 F.2d 33 (10th Cir.).

■ It has been observed, as it has of many similar doctrines, that the rule for directing a verdict is simple to state but its application is "always perplexing and necessarily subject to the human equation." Christopherson v. Humphrey, supra. However, our examination of the record and the authorities convinces us that the trial court here applied the proper standards and did not err by refusing to direct a verdict for the plaintiff-appellant.

To consider further the facts developed at the trial, with reference to the rule above set out, the record shows that although a postmortem examination of the insured's body disclosed medical conditions indicating that the insured did not enjoy excellent health, the parties seem to agree, for purposes of appeal, and the record shows that the insured's death was caused by barbiturate intoxication independently of any other cause. However, there was no direct evidence relating to whether the insured took the fatal overdose of barbiturates accidentally or with the intention of committing suicide. The evidence was wholly circumstantial. As above mentioned, the appellant sought to prove accidental death primarily by introducing circumstantial evidence negating suicide, and the appellee's case was limited to cross-examination of the appellant's witnesses.

The evidence on this aspect of the case may be summarized as follows: The insured's husband and son testified that the insured had never talked of suicide and had not suffered from spells of despondency or melancholy. There was evidence that she enjoyed harmonious relations with her children and grandchildren. On the morning of her death she acted like she had taken a sleeping pill and looked like she had a hangover, and she had a lacerated knee which was then treated. Her physician testified he had seen her "overtake" barbiturates during a drinking episode. No note was found after the insured's death.

There was additional evidence that the insured's aged mother had died some ten days before the insured's death, and that the funeral of a little neighbor girl of the insured was to be held the day the insured died, but there was no evidence that the insured was unusually affected by either event. Her physician testified that during the eighteen years he had attended the insured the only despondency he observed was that common to hangovers. The clinical chemist who made a postmortem examination of the insured's body tissues and gastric contents testified somewhat inconsistently that he could not state the exact period of time over which the barbiturates were taken, but that his analysis indicated a massive dose of barbiturates was taken at one time. The testimony was that insured was "watching television" when the maid left between 1:30 and 2:00 p. m., but when a friend arrived at 3:00 p. m., the insured was unconscious. There was testimony also that a prescription for the barbiturates she used had been filled by a druggist but could not thereafter be traced.

The foregoing summary indicates that there was no real conflict in the evidence, but the evidence was equivocal with respect to the decisive question of fact. We believe that reasonable men could draw different inferences from it and reach different conclusions from the evidence. Therefore the trial court properly submitted the case to the jury.

The appellant also claims errors in the trial court's instructions to the jury. The appellant argues that the trial court's definition of "accidental" was unclear and not susceptible of application to the facts. The appellant preserved this question for appeal by registering his objection when the trial court received objections to the court's charge to the jury. We find the appellant's argument not persuasive. The trial court under the heading "Verdict" in its charge to the jury explained that if the jury found the insured took barbiturates "to induce sleep without any intention to thereby take her own life and that death

resulted," then the verdict should favor the appellant. We think the effect of the trial court's explanation is essentially the same as the appellant's requested instruction, and we find no error.

The appellant also argues that the trial court failed to give the appellant's requested instruction on the presumption against suicide. We need not decide if such an instruction was appropriate in the case at bar or if the Oklahoma cases cited require that such an interpretation be given, for the appellant did not preserve this question for appeal by objecting when the trial court entertained objections to the court's charge to the jury, before the jury retired to consider its verdict. The appellant cannot make his first complaint in this court. Rule 51, Fed.R.Civ.Proc.; Peter Kiewit Sons Co. v. Clayton, 366 F.2d 551 (10th Cir.); Miller v. Brazel, 300 F.2d 283 (10th Cir.).

The final point raised by the appellant is that the jury's verdict is contrary to the evidence. We have discussed the evidence herein and we find the appellant's contention without merit.

Affirmed.